# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Biloxi Marsh Lands Corporation and &ast;
Lake Eugenie Land & Development Inc., &ast;
        &ast;   CASE NO. 12-00382
      Plaintiffs   &ast;
        &ast;
      Versus   &ast;
        &ast;   Hon. Susan G. Braden

The United States of America, &ast;
        &ast;
        &ast;
      Defendant.   &ast;
&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

## FIRST AMENDED COMPLAINT

Plaintiffs, Biloxi Marsh Lands Corporation ("Biloxi") and Lake Eugenie Land & Development, Inc. ("Lake Eugenie") (collectively, "plaintiffs"), bring this action against defendant, the United States of America ("United States" or "government"), and aver:

### Introduction.

1.

This is an action against the United States to obtain just compensation for the government's permanent taking of plaintiffs' properties for public use through inverse condemnation, without exercising the power of eminent domain and without providing plaintiffs just compensation, in violation of the U.S. Constitution, federal statutes, executive regulations and certain conventional (or contractual) servitudes granted by plaintiffs and assigned to the

United States. The taking of plaintiffs' properties is the direct, natural and probable result of the gradual physical processes set in motion by the construction, maintenance (improper or otherwise), operation and expansion of the Mississippi River Gulf Outlet ("MRGO"), a project that was authorized by Congress.

2.

The invasion and/or destruction of plaintiffs' properties have appropriated a benefit to the government at the expense of the plaintiffs and have preempted plaintiffs' rights to enjoy their properties permanently or temporarily.

3.

The gradual physical processes that have eroded and continue to erode plaintiffs' properties to this date have not yet stabilized. Alternatively, if those processes have stabilized, stabilization did not occur until July 9, 2009, when the MRGO was finally physically closed with the construction of a closure structure (made of 352,086 tons of stone) across the entire channel. Moreover, the government's continuous efforts to mitigate the deleterious effects of MRGO and the processes that have eroded plaintiffs' properties – – efforts that began as early as 1983 and continue to this day – – rendered uncertain, at least until the physical closing of the MRGO on July 9, 2009, the accrual of plaintiffs' claims for statute of limitations purposes.

4.

The government's activities in the construction, maintenance (improper or otherwise), operation and expansion of the MRGO are the likely cause of the damage to plaintiffs' properties, and the resulting damage to plaintiffs' properties was foreseeable and was intended by the government.

**Parties.**

5.

Biloxi is a Delaware corporation with its Louisiana principal place of business located at One Galleria Boulevard, No. 902, Metairie, LA 70001. Biloxi is the owner of property that is burdented with certain conventional servitudes and/or servitudes of right of use granted by Biloxi pursuant to Louisiana law for the construction of the MRGO.

6.

Lake Eugenie is a Louisiana corporation with its principal place of business located at One Galleria Boulevard, No. 902, Metairie, LA 70001. Lake Eugenie is the owner of property that is burdened with certain conventional servitudes and/or servitudes of right of use granted by Lake Eugenie pursuant to Louisiana law for the construction of the MRGO.

7.

Made defendant herein is the United States, a sovereign entity and *body politic*. The United States answers and is responsible for one or more of its agencies, including the United States Army Corps of Engineers ("Corps of Engineers" or "Corps") specifically with respect to the MRGO project.

**Jurisdiction.**

8.

This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), which authorizes the United States Court of Federal Claims to render judgment and award money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or

implied contract with the United States. *See United States v. Testan*, 424 U.S. 392, 397-98 (1976).

**Factual Allegations.**

9.

**Project History of MRGO**

The MRGO is a 76-mile-long man-made channel between the Gulf of Mexico and the City of New Orleans. Congress authorized the construction of the MRGO in 1956 to create a means of direct access for deep water vessels from the Gulf of Mexico to the Port of New Orleans, and to further promote economic development of the Port of New Orleans and related facilities in adjacent St. Bernard Parish. H.R. Res. 6309, 84th Cong., 70 State. 65 (1956). The Corps of Engineers began construction of the MRGO in 1958 and the project was completed in 1968.

10.

The MRGO was originally authorized and designed to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet. The 76-mile channel bisected land, forests and marshes along its way. It cut through the Biloxi Marsh estuary and existing natural barriers such as the ridges attendant to Bayous La Loutre, Bienvenue, Yscloskey and Dupre, plus live oak, baldcypress and water tupelo tree stands, which had acted as natural barriers against hurricane winds, storm surge, saltwater intrusion and the unnatural consumption of both wetlands and previously dry lands, including those lands owned by plaintiffs.

11.

The Biloxi Marsh estuary is a 210,000 acre network of coastal wetlands located approximately 30 miles southeast of the City of New Orleans between Chandeleur Sound and

Lake Borgne. This estuary serves as a primary wave and storm surge barrier protecting the City of New Orleans and the surrounding parishes. It is also a unique and productive ecosystem that provides day-to-day benefits for the human and natural environment, including mineral exploration. Biloxi and Lake Eugenie together own approximately 150,000 acres of the Biloxi Marsh estuary.

12.

After Congress authorized the construction of the MRGO, the Board of Commissioners of the Port of New Orleans (the "Port") was designated as the non-Federal project sponsor responsible for furnishing free of cost to the government all lands, easements, rights-of-way, relocations and disposal areas ("LERRDs") required for the construction and maintenance of the MRGO.

13.

On April 19, 1960, Biloxi granted to the Port certain Servitudes for the Construction and Maintenance of Mississippi River-Gulf Outlet (the "Biloxi MRGO Servitudes"), which were recorded in C.O.B. 75 Folio 494, Parish of St. Bernard on April 20, 1960. In the Biloxi MRGO Servitudes, Biloxi granted a 1,500 feet wide servitude, on land owned by Biloxi, for the construction and maintenance of the MRGO. Those servitudes were subsequently assigned by the Port to the United States through the Corps of Engineers for the construction and maintenance of the MRGO. The MRGO was built on lands burdened with the Biloxi MRGO Servitudes.

14.

Biloxi also granted to the Port a Right of Entry and temporary spoil disposal servitudes, which the Port also assigned to the United States through the Corps of Engineers.

15.

At about the same time, the exact date being unknown at this time due to the destruction of records at the St. Bernard Parish Court House caused by Hurricane Katrina in 2005, Lake Eugenie granted to the Port similar 1500 feet wide servitudes, on land owned by Lake Eugenie, for the construction and maintenance of the MRGO (the "Lake Eugenie MRGO Servitudes"). Those servitudes were also assigned by the Port to the United States through the Corps of Engineers for the construction and maintenance of the MRGO. The MRGO was built on lands burdened with the Lake Eugenie MRGO Servitudes.

16.

Lake Eugenie also granted to the Port a Right of Entry and temporary spoil disposal servitudes, which the Port also assigned to the United States through the Corps of Engineers.

17.

The lands outside of the original 650 feet wide channel, the lands adjacent to and outside of the Biloxi MRGO Servitudes, and the lands adjacent to and outside of the Lake Eugenie MRGO Servitudes have continued to erode to this date and will continue to erode in the future unless shore protection measures are taken to prevent further erosion. The lands that have not yet eroded completely have been damaged to the extent that plaintiffs cannot use them, or their values have diminished considerably due to the damage, which constitutes a taking. Furthermore, as a result of erosion, plaintiffs' ownership of the submerged lands and/or the underlying minerals could be lost to the State of Louisiana pursuant to Louisiana law.

18.

Plaintiffs' properties have been taken without just compensation by the United States through the gradual physical process set in the motion by the Corps of Engineers' construction, maintenance (improper or otherwise), operation and expansion of the MRGO.

19.

Plaintiffs are entitled to compensation for the lands adjacent to the MRGO taken by the government in an amount of at least 100 million dollars. While plaintiffs have not yet determined the exact amount of compensation they are entitled to receive for the approximately 150,000 acres of the Biloxi Marsh estuary owned by plaintiffs that have not yet eroded completely, but which have been taken by the government as a result of damage caused by the government, this amount is estimated to be in billions of dollars. Furthermore, plaintiffs have not yet determined the amount of compensation they are entitled to receive for the lands reasonably foreseen to be lost to future erosion, but the cost of providing shore protection measures to prevent future erosion (an alternative measure of damage) is approximately $59,242,000 dollars. Plaintiffs demand compensation for all these amounts.

20.

**Environmental Effects**

The habitats traversed by the MRGO are dominated by shallow estuarine waters and sub-delta marshes. Since the construction of the MRGO, several basic impacts on the region have become evident. These include wetland loss caused by excavation and maintenance (improper or otherwise) of the channel, soil erosion, shifts in habitat type because of increased salinity, and wave action, suction and propeller backwash from passing ships and other marine vessels, among others. The New Orleans District of the Corps of Engineers believes that the loss of

wetlands in the area approaches nearly 3,400 acres of fresh/intermediate marsh. More than 10,300 acres of brackish marsh, 4,200 acres of saline marsh, and 1,500 acres of cypress swamps and levee forests have been destroyed or severely altered. Approximately 4,200 acres of highly productive marsh adjacent to the MRGO have eroded. Wetland loss and deterioration caused by MRGO have allowed for expanded tidal amplitude and duration, increasing the flooding risk to interior portions of St. Bernard Parish, and the erosion of plaintiffs' lands.

21.

**Prior Knowledge of Potential Harmful Effects**

In April 1958, the United States Department of Interior, through its Branch of River Basins Office in Vicksburg, Mississippi, at the request of the District Engineer for New Orleans, prepared a draft preliminary report for the Corps of Engineers pursuant to the Wildlife Coordination Act of 1946 predicting vast ecological damage from the MRGO. In the opening section of this report, entitled *An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies* (the "*Fish & Wildlife Report*") the authors noted with respect to plans for the MRGO project:[1]

> The U.S. Fish and Wildlife Service initiated preliminary studies on the project in 1957. Secretary Seaton, Department of the Interior, in a letter of September 23, 1957, informed the Secretary of the Army that *the project is of great concern to fish and wildlife conservationists*, including the commercial fishing industry. The Secretary noted *the project plans had not been investigated by fish and wildlife conservation agencies, as contemplated in the Wildlife Coordination Act of August 14, 1946* (60 Stat. 1080), and requested the Corps of Engineers to bring all phases of project planning into balance.

---

[1] *Fish & Wildlife Report* at 1 (emphasis added).

22.

Despite the fact that the Corps of Engineers did not afford the U.S. Fish and Wildlife Service a sufficient opportunity to study the MRGO project–and recommend mitigation measures and feasible alternatives–before construction began, the *Fish & Wildlife Report* contained numerous observations concerning the MRGO waterway's negative impact on the surrounding marsh eco-system.  First, the document states:[2]

> Wildlife is frequently referred to as a [product] of edges; *this area is an edge of magnificent proportion.*  The marsh and estuarine area associated with the distributaries of the Mississippi River is about 70 miles wide and extends for about 150 miles along the coast.  The climate is favorable, with a long growing season and abundant rainfall.  This, coupled with other physiographic conditions, permits a biological succession which results *in an inconceivably large supply of living plants and animal organisms* – the fundamental food supply of our fresh and salt water food fishes, turtles, alligators, shrimp, oysters, fur-bearing animals, ducks, and other birds.  *These in the aggregate constitute perhaps the densest and richest wild fauna in the world*, considered both from the commercial and recreational values.

23.

The *Fish & Wildlife Report* then described the extreme sensitivity of coastal marshland to salinity levels:[3]

> *The critical factors of circulation patterns and* salinity are easily recognizable here…. *Also of spectacular importance are the hydrological* aspects which maintain a brackish vegetative environment highly suitable to waterfowl and fur animals.  This flora has a narrow salinity range; therefore, desirable production must result from *exacting conditions….* With the proposed channel, certain quantitative changes are apparent.  The 36-foot-deep cut will result in direct changes of salinity conditions adjacent to the canal.  Being a sea level channel, some drainage or reduction and/or increase in water levels in certain areas must be anticipated.

---

[2] *Id.* at 8 (emphasis added).
[3] *Id.* at 16 (emphasis added).

24.

The *Fish & Wildlife Report* further predicted the harmful effects of MRGO on existing

water circulation patterns:

> [T]he effect of the cut and the spoil upon existing water circulation
> patterns, if considered only from the physical aspects, *appear*
> *consequential*. A bisecting cut and spoilage through the center of the
> marsh, Chandeleur Sound and Island chain will interrupt the net
> circulation of waters flowing at right angles to the channel alignment. It
> is entirely probable that *both the direct and indirect effect of this change*
> *will be hydrographically manifested throughout the tentatively*
> *established appraisal area.*[4]

25.

As for the MRGO's effect on subsurface soil and "turbidity," a cloudy condition in water

due to suspended silt or organic matter, the *Fish & Wildlife Report* noted:[5]

> Direct burial by sedimentation of oyster bottoms, nursery grounds, and
> vegetative areas is a self-explanatory physical feature easily observed
> from dredging operation in other estuarine areas… Turbidity, whether
> temporary or permanent, because of associated hydrological complexities
> is more difficult to predict. The usual condition, however, is for
> temporary turbidity to have adverse short-lived effects on submerged
> vegetation over an extensive area. *It is therefore probable that*
> *construction or continuous maintenance operations would produce a*
> *temporary turbidity type for sufficient duration to accrue long-term*
> *damaging ecological changes.*

26.

The *Fish & Wildlife Report* further cautioned that MRGO could permanently destroy the

vegetation in the marshland areas:[6]

> It is conceivable also that the *permanent turbidity type would prevent*
> *reestablishment of destroyed animal and vegetation zones in certain areas.*
> Hydraulic dredging, in particular, tends to separate bottom soils into
> individual particles which have a long suspension duration. Certain clays
> and organic soil particles produce a serious and persistent turbidity unless

---

[4] *Id.* at 17 (emphasis added).
[5] *Id.* at 18 (emphasis added).
[6] *Id.* at 18 (emphasis added).

flocculated [the creation of soil lumps or masses] by sea salts. There is a risk that flocculation will result in the establishment of false bottoms or ooze areas, destroying present bottom productive potential and creating the continuous hazard of turbid conditions by only minor water agitation… Any turbidity resulting in a plant kill can have further indirect effects by loss of the important mechanical and chemical stabilizing effects that plants provide against bottom agitation.

27.

Later in the *MRGO Bank Erosion Reconnaisance Report* published in 1988, the Corps warned of erosion to the banks of the MRGO:[7]

The unleveed banks of the MRGO will continue to erode in the absence of remedial action. Currently, banks of the unleveed reached are retreating at rates from five to over 40 feet per year. The average rate of retreat of the north bank in the 41-mile land cut portion of the waterway is about 15 feet per year. Failure to reduce bank erosion will result in a significant increase in the required maintenance dredging of the waterway in the future. Annual average maintenance dredging requirements are projected to increase six-fold within the next 15 years (by the year 2002). The dredged material disposal area located on the MRGO south bank between mile 23 and mile 27 could be exhausted by year 2017.

28.

Despite knowledge of these potential destructive effects, the Corps of Engineers went ahead with the construction of the MRGO, and continued to operate, maintain (improperly or otherwise) and expand the MRGO, thereby acting with disregard of plaintiffs' properties, from which it is possible to infer the government's intent to invade the plaintiffs' property interests. The taking of plaintiffs' properties as a result of the government's MRGO–related activities was foreseeable.

---

[7] *Bank Erosion Reconnaisance Report*, pp. 30-31.

**Wetlands Provide Flood Protection**

Wetlands function as natural sponges that trap and slowly release surface water, rain, snowmelt, groundwater and flood waters. Trees, root mats, and other wetland vegetation also slow the speed of flood waters and distributes them more slowly over the floodplain. This combined water storage and braking action lowers flood heights and reduces erosion. The holding capacity of wetlands helps control floods. Preserving and restoring wetlands, together with other water retention, often provide the level of flood control otherwise provided by expensive dredge operations and levees.

**Wetlands Destruction by Soil Erosion**

The MRGO channel was excavated through 40 miles of the virgin wetlands of lower St. Bernard Parish and cut through four natural levees to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet. The sides of the original channel were at a 25 degree angle, and while the Corps of Engineers did not initially "armor" the banks of the MRGO, it was prepared to provide foreshore protection "if and when the need for it becomes necessary." Because the soft soils on the sides of the original channel would not stand up at such a steep angle, and because of the maintenance (improper or otherwise) conducted by the Corps of Engineers, the soil began to slide or "slough-off" into the bottom of the channel. Thus, in a report issued by the District Engineer in November of 1968, the Corps stated that "[r]iprap foreshore protection against erosion by wave wash from shipping will be provided." Notwithstanding attempts to stop or slow it, the erosion process has continued over the years up to this date, and as a result, the channel is now over 2,000 feet wide at the surface. This

"sloughing-off" of the soft sides along the channel banks explains in part why the MRGO's banks have grown from 650 feet wide to over 2,000 feet wide today, eroding plaintiffs' lands in the process. This erosion process will continue into the future unless additional and complete shore protection measures to prevent future erosion are immediately implemented, and will result in the taking of additional property from plaintiffs.

31.

**Wetlands Destruction by Saltwater Intrusion**

The MRGO has no current like the Mississippi River and saltwater from the Gulf of Mexico flows up the MRGO and into the St. Bernard Parish marshes through which the channel was dug. This saltwater intrusion kills the natural vegetation of the marsh and the roots of these dead plants can no longer hold the soil together along the MRGO channel banks. Tidal flows, and the wave action, suction, and propeller backwash and wakes from passing ships and other marine vessels erode the soil from the MRGO channel banks and it settles into the bottom of the channel. This process has caused erosion of plaintiffs' lands.

32.

**Wetlands Destruction by Dredging**

Soil from the MRGO's banks, which settles in the bottom of the channel, impedes the movement of ships. In order to maintain the depth of the channel to allow ships to pass, the Corps of Engineers continuously dredged soil from the bottom and slope of the channel until 2005. This continuous dredging and maintenance (improper or otherwise) has further eroded plaintiffs' properties. Some of the dredged soil is piled on spoil banks along the channel, which have caused further damage to the wetlands behind the spoil banks, including plaintiffs' lands.

33.

**Damage to Plaintiffs' Property**

The construction, maintenance (improper or otherwise), operation and expansion of the MRGO project has resulted in the ongoing taking of plaintiffs' lands beyond the 650-wide channel and beyond the 1500 feet wide servitudes plaintiffs granted for that purpose. The loss of plaintiffs' lands is a direct, natural or probable consequence of the events described above, including, without limitation, soil erosion, wake and wave action in the channel, continuous dredging, maintenance (improper or otherwise) and saltwater intrusion, which have continued eroding and widening the MRGO, beyond its authorized width and beyond the Biloxi MRGO servitudes and the Lake Eugenie Servitudes, until today, or at least up until its physical closing on July 9, 2009.

34.

These processes engendered wetlands loss, consumption of tree stands, dry lands, healthy vegetation, fresh water and brackish marshes, in addition to saltwater intrusion and receptive flooding events, all as direct, natural or probable consequences of the MRGO project.

35.

Plaintiffs allowed the government the right to build only a 650 feet wide navigation channel and only within the boundaries of the Biloxi MRGO Servitudes and the Lake Eugenie MRGO Servitudes they granted to the Port (which were assigned to the government). Because the channel has eroded past the original 650 feet width of the authorized navigation channel and past the boundaries of the servitudes, the government is required to compensate plaintiffs for the land that has eroded (both in areas adjacent to the original 650 feet wide authorized channel and beyond the boundaries of servitudes), which the government has taken without just

compensation. *Kinspoint Horizontal Property Regime, et. al. v. United States*, 46 Fed. Cl. 691 (2000). The government is also required to compensate plaintiffs for the value of the lands reasonably foreseen to be lost to future erosion, or the cost of providing shore protection measures to prevent future erosion. *Banks v. United States*, 78 Fed. Cl. 603 (Fed. Cl. 2007).

36.

The consumption of plaintiffs' lands, wetlands loss and physical invasions of plaintiffs' properties also constitute takings of plaintiffs' vested property interests in violation of Louisiana law.[8] All takings are the direct, natural or probable consequence of the MRGO project.

37.

**The Statute of Limitations Has Not Run[9]**

Plaintiffs allege a taking, not by an overt act of condemnation, but by gradual and continuous processes of erosion of their land and wetlands loss. A "continuous physical taking process is very gradual. . . . [T]he almost imperceptible physical process has delayed detection of the full extent of the destruction—a necessary precondition of striking a final account." *Applegate v. United States*, 25 F.3d 1579, 1582 (Fed. Cir. 1994).

38.

The gradual physical process that is causing the disappearance of plaintiffs' properties did not stabilize before July 9, 2009, when the MRGO was physically closed to ship traffic. Indeed, the situation is not yet stabilized because the physical processes the MRGO set in motion

---

[8] The Louisiana Civil Code confers upon the owners of a thing the right to "use, enjoy, and dispose of it within the limits and conditions established by law." La. Civ. Code art. 477(A)(1996). At Civil Law, the three components of full ownership (roughly equivalent to a fee simple at common law) are: "(1) *usus* – the right to use or possess, i.e., hold, occupy and utilize the property; (2) *abusus* – the right to abuse or alienate, i.e., transfer, lease, and encumber the property, and (3) *fructus* – the right to the fruits, i.e., to receive and enjoy the earnings, profits, rents and revenues produced by or derived from the propterty." *Rodrigue v. Rodrigue*, 218 F.3d 432, 437 (5th Cir. 2000) (citing *Giroir v. Dumesnil*, 148 So. 2d 1, 6 (La. 1966)).

[9] *See United States v. Dickinson*, 331 U.S. 745 (1947); *United States v. General Motors Corp.*, 323 U.S. 373 (1945); *Banks v. U.S.,* 79 Fed. Cl. 686 (Fed. Cl. 2007); *St. Bernard Parish Government, et. al. v. The United States*, 88 Fd. Cl. 528 (Fed.Cl. 2009).

continue to erode plaintiffs' properties to this date.

39.

Even if the geography and hydrology of MRGO had stabilized before July 9, 2009 (the date MRGO was closed), the statute of limitations for plaintiffs' takings claims has not expired because the government itself negated stabilization with its efforts to mitigate the destructive effects of MRGO on plaintiffs' lands and on the natural flood barriers of southeast Louisiana, thereby rendering uncertain until July 9, 2009 the accrual of plaintiffs' taking claims for statute of limitation purposes. *Applegate v. United States*, 25 F.3d 1579 (Fed. Cir. 1994).

40.

The Corps of Engineers' mitigation programs continued after July 9, 2009 with projects to construct enormous floodgates across the inner reach of the MRGO, and to restore the coastal wetlands destroyed by MRGO.

41.

In 1962 the Corps stated that riprap foreshore protection "will be provided." Furthermore, evidence recently disclosed by the government confirms that (1) at least since 1983 the government has recognized the need to take action and has planned for the mitigation and restoration of wetlands eroded as a result of the operation and maintenance of the MRGO, and those restoration projects were implemented and continue underway today in some areas of the MRGO; and (2) at least since 1985 the government has engaged in restoration efforts on plaintiffs' property.

42.

These actions by the government are made evident by an Environmental Assessment (No. 38), which is dated August 31, 1983 and examined environmental impacts associated with the

MRGO, Foreshore Protection Test Section located two miles south of the confluence of the MRGO and the Gulf Intracoastal Waterway.[10] Thus clearly foreshore protection had been installed, at least on a test basis, prior to that date. A second Environmental Assessment (No. 47), dated January 28, 1985, addressed MRGO foreshore protection on the south bank between the Bayou Bienvenue Control Structure and the end of the Chalmette Loop Hurricane Protection Levee.[11]

43.

In November, 1984, the Corps submitted plans for the restoration of wetlands along the inland reach of the MRGO (miles 23-60) by the placement of dredged material derived from maintenance of the inland reach (1,050 annual cubic yards) to create 5,000 acres of marsh, 100 acres per year, over a 50 year period.[12] Plaintiffs own property adjacent to miles 23-35 of the inland reach and their land was partially restored.

44.

In addition, the Corps recognized that operation and maintenance of the MRGO required additional project features, the construction of bank stabilization measures (foreshore protection) along the north and south banks of the inland reach of the MRGO, to prevent sloughing of the bank into the channel and to protect adjacent wetlands.[13] Accordingly, the Corps constructed foreshore protection along the banks of the inland reaches of the MRGO, including along plaintiffs' property between miles 32.6-33.8,[14] and placed dredged material from the inland reach

---

[10] *See,* Environmental Assessment, Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana, Bank Stabilization, Miles 50.5 to 55.0, EA #152. This document is Joint Exhibit JX-0150 in the *Robinson* trial.
[11] *See,* EA #152.

[12] Louisiana Coastal Land Loss and Marsh Creation Initial Evaluation Study – November 1984 – syllabus page 2.
[13] Integrated Final Report to Congress and Legislative Environmental Impact Statement for the MRGO Deep-Draft De-Authorization Study – November 2007, revised June 2008, page 6.
[14] Id.

of the MRGO on the north and south banks for marsh creation (16 acres per year average) during the period from 1985 to 2003,[15] including on plaintiffs' property adjacent to the MRGO.[16]

45.

Two exhibits from the trial of the *Robinson* case prepared by the government show that prior to 1988 the government was already attempting to repair the damage to plaintiffs' property. Exhibit DM-0021 is a trial demonstrative map created by the government that shows the beneficial use of dredge material and the locations where it was used from 1985 to 2003 for marsh creation. According to the map, plaintiffs' property (miles 21-23, 33-34) received dredged material for restoration. Other areas of MRGO that also received dredge material for marsh creation are shown in the map.

46.

Exhibit DM-0026 is another trial demonstrative map by the government that shows the locations where the government constructed foreshore protection. Plaintiffs' property (miles 33-34) received foreshore protection as shown in the map. The map shows other areas along the MRGO that also received foreshore protection.

47.

Thus, aside from the fact that the damage caused by MRGO did not stabilize until its closure, the evidence recently received by plaintiffs show that in 1962 the Corps promised to install foreshore protection, and at least since 1983 the Corps has been involved in restoration projects along the MRGO and on plaintiffs' property. These activities by the Corps rendered uncertain the accrual of plaintiffs' claims for statute of limitation purpose.

---

[15] Id., page 7.
[16] Id., pages 8, 11-13.

48.

The Corps and other federal agencies have for many years undertaken other enormous projects to mitigate the destructive effects of the MRGO. These mitigation efforts also created uncertainty about the fate of plaintiffs' properties and thereby delayed the running of the statute of limitations. Plaintiffs refrained from suing because of the government's promised relief, which has not restored plaintiffs' land. Representative examples of these mitigation projects are discussed below.

49.

On November 29, 1999, in response to the increased public awareness of the destructive impact MRGO had on Louisiana's wetlands, Congress enacted the Non-Indigenous Aquatic Nuisance and Control Act of 1990 (101 Pub. L. 646), which included, under Title III thereof, the federal Coastal Wetlands Planning, Protection and Restoration Act of 1990 ("the Breaux Act"). The Breaux Act was enacted to restore wetlands exclusively in Louisiana; it encompasses "143 projects" that "will create, protect, or restore over 120,000 acres of wetlands in coastal Louisiana."[17] Since passage, the Breaux Act has dedicated $40 million annually to restoring wetlands in southeastern Louisiana.[18] A number of these projects are specifically targeted to ameliorate the destructive impact of MRGO, such as the MRGO Back Dike Marsh Project and the Shore Protection and Marsh Creation in Lake Borgne at Shell Beach Project, which "will maintain the integrity of the marshes that separates Lake Borgne from the MRGO."[19]

---

[17] *Post-Katrina Clean-Up and Reconstruction Management Before S. Comm. On Environment and Public Works,* Congressional Quarterly Testimony (February 26, 2007) (statement of John Paul Woodley, Jr., Assistant Secretary of the Army (Civil Works)) at 6.

[18] B.F. Krumrine *et al.*, *Coastal Restoration Division Annual Project Reviews (La. Dept. of Natural Resources*, Dec. 2001) at 1.

[19] *See id.* at 5. Both of these projects either began after 1999 or were ongoing after 1999. The MRGO Back Dike project was being implemented as of December of 2001. The Shore Protection project near Shell Beach was, as of December 2001, authorized for future construction. *Id.*

50.

In the Breaux Act Congress mandated that a Task Force, headed by the Secretary of the Corps of Engineers, implement a plan for restoration of Louisiana's coastal wetlands and provide the plan within three years.

51.

Accordingly, in November of 1993 the Task Force issued a comprehensive restoration plan,[20] utilizing tools such as hydrologic restoration, shoreline protection, and marsh creation with dredged material to preserve and create marsh.[21]   For the restoration of the MRGO ecosystem, the plan calls for diversions from the Mississippi River into the St. Bernard Parish coastal area, which would provide fresh water and sediment for marsh creation in the area of Biloxi and Lake Eugenie's property along the MRGO, for construction of "shoreline/bank protection" all along the MRGO, which would protect against further erosion of the Biloxi Marsh and Lake Eugenie property adjacent to the MRGO, and for "barrier island restoration" which would provide for restoration of Lake Eugenie and Biloxi Marsh wetlands from the foot of the inland reach of the MRGO around the perimeter of the land commonly referred to as the Biloxi Marsh.[22]

52.

In 1998, the Task Force authored a comprehensive report for the restoration of coastal Louisiana, entitled, the "Coast 2050 Plan."[23] The Coast 2050 Plan calls for several specific near and long term strategies for wetlands restoration in the region of the MRGO, which include (1) a wetlands sustaining diversion from the Mississippi River near Violet, Louisiana, once the

---

[20] Exhibit C - Louisiana Coastal Wetlands Restoration Plan – Main Report and Environmental Impact Statement, page 1
[21] Id., page 9
[22] Id., Figure 3, page 11
[23] Exhibit E - Coast 2050: Toward a Sustainable Coastal Louisiana, page 7

MRGO is closed; (2) closing the MRGO to deep-draft navigation; (3) stabilizing the entire north

bank of the MRGO as soon as possible  and continue to beneficially use dredged material

deposited behind the rock stabilization of the MRGO; and (4) using dredged material from the

MRGO to create marsh in South Lake Borgne (some of which is Biloxi property), the Biloxi

Marshes (a majority of which is Biloxi property), and Eloi Bay (Lake Eugenie property).[24]

53.

Under a different statute, the Water Resources Development Act, the Corps of Engineers

conducted three projects along the MRGO in 1999 to create 76 acres of wetlands with material

dredged from the channel.[25]

54.

In 2000, a Task Force of the Environmental Protection Agency ("EPA") reported on its

Comprehensive Plan for Timely Modification of the MRGO.[26]  This endeavor was initiated by

the EPA in 1999 "in direct response" to the "1998 resolution passed by St. Bernard Parish

seeking closure of the channel."[27]  It addressed "modification of the MRGO, potentially

including closure of the channel," and it noted the important issues of "environmental

restoration, and hurricane protection."[28]

55.

In November, 2004, the Corps published a report with definitive plans for restoration of

the erosion caused by MRGO.  In the report, which is entitled "Louisiana Coastal Area,

---

[24] Id., pages 87-90
[25] *See id.* at 6
[26] Wilson and Associates, Inc., *Status Report – Comprehensive Plan for Timely Modification of the Mississippi River Gulf Outlet* ("Wilson Status Report")(July 31, 2000).
[27] *Id.* at p. 2-5.
[28] *Id*.

Ecosystem Restoration Study,"[29] the Corps warned that "the rate of wetland loss in the area is *accelerating*."[30]   Therefore, "[r]apid action is required to protect the integrity of the southern Lake Borgne shoreline and to prevent continued erosion of the MRGO channel banks from ocean-going vessel wakes.   Additional ecosystem restoration features are required to address serious ecological problems" caused by MRGO.[31]   "Without action, critical landscape components that make up the Lake Borgne estuary would be lost and future efforts to restore other parts of the ecosystem would be much more difficult and expensive if not impossible."[32] The Corps identified multiple "[c]ritical action points" along the MRGO that "face significant risk of losing the integrity of bayou banks" and that threaten "a potential major breach of the navigation channel into the lake"—a breach that "would result in rapid wetlands loss as storm waves from the lake and ship wakes from the channel impact sensitive interior wetlands."[33] The report called for specific near-term and long-range actions to mitigate the environmental damages caused by MRGO in order to prevent predicted future land loss and restore previously degraded wetlands.   The Corps therefore proposed building 38 miles of rock breakwaters to prevent the merger of the MRGO into Lake Borgne,[34] noting that "[s]trategic placement of similar protective breakwaters has been effectively used along the MRGO in other locations to prevent bankline retreat and to protect large areas of estuarine wetlands from further erosion and

---

[29] United States Army Corps of Engineers, *Louisiana Coastal Area, Ecosystem Restoration Study*, Attachment 5 (November 2004).
[30] *Id.* at 31.
[31] *Id.*
[32] *Id.*
[33] *Id.* at 32.
[34] *Id.* at 3, 32.

degradation."[35]  The Corps warned that the "merging of Lake Borgne into the MRGO" would "threaten[] nearby coastal communities" including "Shell Beach, Yscloskey and Hopedale."[36]

56.

Finally, in 2008 the Corps admitted defeat and formally recommended total closure of the MRGO by erection of a rock dike across its entire width and the construction of other "rock dikes that protect wetlands along the MRGO."[37]  On June 5, 2008, the Assistant Secretary of the Army of Civil Works (ASA(CW)) forwarded the *U.S. Army Corps of Engineers Chief's Report for the Mississippi River Gulf Outlet (MRGO) Deep–Draft De-Authorization Study* ("Deep–Draft De–authorization Report") to Congress.  This action officially de-authorized the MRGO from the Gulf Intracoastal Waterway to the Gulf of Mexico in accordance with the Water Resources Development Act of 2007 ("WRDA").  The WRDA also authorized other projects to repair the effects of MRGO. [38]

57.

The Deep–Draft De–authorization Report recommended total closure of the MRGO by erection of a rock dike across its entire width and the construction of other "rock dikes that protect wetlands along the MRGO."[39]  The Corps acknowledged that "the highest rates of

---

[35] *Id*. at 2.

[36] Army Corps of Engineers, Lake Borgne – Mississippi River Gulf Outlet Shoreline Protection (PO-32) Final Design Report (December 2004) at 10.  *See also id.* at 2. The Corps acknowledged that the real problem was not nature, but the MRGO, because shoreline erosion rates in the MRGO channel were between three and five times the erosion rate in Lake Borgne.  *Id*. at 10.  *See also* Intent to Prepare A Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet, Louisiana, Navigation Project – Bank Stabilization, 71 Fed. Reg. 74,490, 74,491 (December 12, 2006).

[37] U.S. Army Corps of Engineers, Executive Summary of the Mississippi River-Gulf Outlet Deep-Draft De-Authorization Final Report to Congress ("Draft De-Authorization Report") (May 2007) at 13 (attached as Exhibit 1). *See also* U.S. Army Corps of Engineers, Integrated Final Report to Congress and Legislative Environmental Impact Statement for the Mississippi River – Gulf Outlet Deep-Draft De-Authorization Study ("Final Deep Draft De-Authorization Study") (June 2008) at xvii-xviii, 119 (attached as Exhibit 2).

[38] Draft De-Authorization Report at 6.  *See also* Final Deep Draft De-Authorization Study at xiv, 6.

[39] U.S. Army Corps of Engineers, Executive Summary of the Mississippi River-Gulf Outlet Deep-Draft De-Authorization Final Report to Congress ("Draft De-Authorization Report") (May 2007) at 13.  *See also* U.S. Army Corps of Engineers, Integrated Final Report to Congress and Legislative Environmental Impact Statement for the

erosion in the area" occur in the MRGO, in "excess of 35 feet" of shoreline per year, "result[ing] in the direct loss of approximately 100 acres of shoreline brackish marsh every year. Additional losses of wetlands and shallow ponds result from high tidal ranges and rapid water exchange" through the MRGO.[40]  Closure of the MRGO was completed July 9, 2009.

58.

The Corps understood that merely damming the MRGO will not undo the destruction it has wrought. The Corps also developed the MRGO Ecosystem Restoration Plan as a supplement to the Deep–Draft De–Authorization Report. This comprehensive ecosystem restoration plan, which was also authorized by the WRDA, is aimed at the restoration and conservation of estuarine habitat areas affected by the MRGO navigation channel.

59.

The Corps and other federal agencies released in 2008 their Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet, Louisiana and Lake Borgne —Wetland Creation and Shoreline Protection project ("Wetland Creation DEIS").[41]  This report reviewed the past and pending projects aimed at mitigating the problems caused by the MRGO[42] and addressed "the problems of wetland loss, shoreline erosion, saltwater intrusion and storm surge threats in the MRGO and Lake Borgne area. Without intervention, these problems will progressively worsen, especially once the land bridge between Lake Borgne and the MRGO is eroded away.

---

Mississippi River – Gulf Outlet Deep-Draft De-Authorization Study ("Final Deep Draft De-Authorization Study") (June 2008) at xvii-xviii, 119.

[40] Draft De-Authorization Report at 6.  *See also* Final Deep Draft De-Authorization Study at xiv, 6.

[41] U.S. Army Corps of Engineers, Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet (MRGO), Louisiana, and Lake Borgne – Wetland Creation and Shoreline Protection Project ("DEIS") (October 2008).

[42] *See id.* at pp. 1-8 to 1-17.

The [Corps] propose[d] to protect, restore and increase wetlands in the MRGO and Lake Borgne area."[43]

60.

Specifically, the Corps "recognized the need for critical near-term restoration of the land bridge between the MRGO and Lake Borgne."[44]  "The protection of this critical land bridge is vital to prevent the exposure of the Hurricane Protection System (HPS) levees in Orleans Parish and St. Bernard Parish from [*sic*] the full effects of storm-driven waves and storm surge. . . . [T]he loss of wetland areas does increase storm surge and wave potential at the hurricane protection system."[45]  The Corps therefore urged the appropriation of $108 million to restore the land bridge, the banks of MRGO and the associated wetlands.[46]  Unfortunately, none of these projects have yet restored plaintiffs' lands.

61.

The Corps has recognized that "[c]onstruction and maintenance of the MRGO caused widespread wetland loss and damage to estuarine habitats from the outer barrier islands in the lower Chandeleur chain to the cypress forests and tidal fresh water marshes in the western reaches of the Lake Borgne basin."[47]  "Continued operation of the MRGO results in high rates of shoreline erosion . . . which destroys wetlands and threatens . . . adjacent communities."[48]

---

[43] *Id.* at p. 1-2. *See also id.* at pp. 1-6 to 1-7.

[44] *Id.* at p. 1-6.

[45] *Id.* at p. 1-5.  Although the Corps noted that its current data made it difficult to quantify the precise effect of wetland loss for particular places, it knew enough to conclude that restored "wetlands would have a net effect of lower storm surge and a lower maximum storm wave height for smaller storm conditions" if the MRGO were closed and the wetlands restored, "compared to the future conditions with the No-Action Alternative with extensive emergent wetland loss."  *Id.*

[46] *Id.* at p. 1-6. This project was recommended by the Corps at least as early as 2004, but was apparently still unfunded as of October 2008.  *See id.*

[47] Intent to Prepare A Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet, Louisiana, Navigation Project – Bank Stabilization, 71 Fed. Reg. at 74,491.

[48] *Id.  See also* United States Army Corps of Engineers, *Louisiana Coastal Area, Ecosystem Restoration Study*, Attachment 5 (November 2004) at 2, 6-7, 31 (attached as Exhibit 8).

62.

The October 2000 report of a federal task force convened by the EPA (and which included the Corps of Engineers) concluded that the "construction, operation and maintenance of the MRGO have caused substantial environmental changes," have "breached major hydrologic boundaries," and have cost Louisiana "[m]ore than 65,000 acres of natural habitat."[49] The EPA specifically highlighted MRGO's role "in creating an avenue for surge movement during storms," its "erosion of the wetlands that provide an apron benefiting flood protection levees," and its "breach of wetlands that buffer large lakes from the channel."[50] The EPA task force reported that, as a result of MRGO, "there are no fresh or brackish water marshes left in St. Bernard."[51] "Land loss due to salt water intrusion and wave action along the MRGO has been devastating. **The right of way, purchased by the Federal Government for the construction and maintenance of the MRGO has long been out of [its] boundaries. The result is that the property of private landowners is being literally washed away. This committee feels that it is only fair these property owners be compensated at fair market value.**"[52] The EPA noted that proponents of closing the MRGO "see it as a land-eating disaster that should be substantially eliminated and remediated."[53]

63.

Accordingly, the Corps belatedly urged that the MRGO be closed (a recommendation that Congress accepted) and, in October 2008, the Corps was developing a "comprehensive

---

[49] Wilson Status Report at p. 2-1.
[50] *Id.* at pp.2-1 to 2-2.
[51] *Id.* at p. 3-13 (quoting a report of the Task Force's Environmental Subcommittee).
[52] *Id.* at pp. 3-13 to 3-14.
[53] *Id*. at p. 4-2.

ecosystem restoration plan to restore the areas affected by the MRGO navigation channel."[54]

The Corps' plans include:

> (1) Physically modifying the MRGO channel and **restoring areas affected by the channel**; (2) restoring natural ecosystem features to reduce damage from storm surge; (3) measures preventing saltwater intrusion into the waterway; (4) measures protecting, restoring or increasing wetlands to prevent saltwater intrusion or storm surge; (5) measures reducing risk of storm damage to communities by preventing or reducing wetland losses or restoring wetlands . . .[55]

64.

The documents cited and described above clearly show that these projects were not merely promises but actual projects attempting to ameliorate and correct the problems caused by MRGO and the destruction of its banks, and to repair lands along the MRGO, including plaintiffs' property.

65.

The statute of limitations for the plaintiffs' taking claims could not have begun to run before July 9, 2009 and, under the Supreme Court's rule in *Dickinson*, this suit is timely filed. In addition, and as an alternative, the statute of limitations would nevertheless not bar this suit because the efforts and proposals by the Corps to mitigate the adverse effects of MRGO have prevented the stabilization of the plaintiffs' taking claims under the doctrine established by the Federal Circuit in *Applegate* and *Banks*.

## First Count: Permanent Taking of Property.

66.

Plaintiffs reallege paragraphs 1 through 65 of this Amended Complaint and incorporate same by reference.

---

[54] Intent to Prepare a Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet Ecosystem Restoration Feasibility Study, 73 Fed. Reg. 57,340, 57,341 (October 2, 2008).
[55] *Id.*

67.

As a direct, natural or probable consequence of the MRGO project, including the construction, maintenance (improper or otherwise), operation and expansion of the channel attendant to this project, plaintiffs have been deprived of the use, occupancy and enjoyment of their immovable property, resulting in a permanent taking of their property for a public use, without payment of just compensation.

68.

Plaintiffs are entitled to recover, and the government is required to compensate plaintiffs in (1) the sum of at least $100 million for the value of the land that has eroded adjacent to the original 650 feet wide authorized navigation channel; and (2) an amount yet to be determined for the value of the land taken beyond the servitudes, which is estimated to run in billions of dollars.

**Second Count:  Cost of Mitigation or Payment for Future Taking of Property.**

69.

Plaintiffs reallege paragraph 1 through 68 of this Amended Complaint and incorporate same by reference.

70.

Plaintiffs' lands will continue to erode unless shore protection is provided.  This erosion of plaintiffs' lands, which is a direct, natural or probable consequence of the MRGO project, will further deprive plaintiffs of the use, occupancy and enjoyment of their immovable property, resulting in a permanent taking of their property for a public use, without the payment of just compensation.  Plaintiffs are entitled to receive payment of an amount equal to the cost of providing shore protection, which is estimated to be $59,242,000, or the estimated value of the land reasonably expected to erode in the future if shore protection is not provided.

**Third Count:   Temporary Taking of Property.**

71.

Plaintiffs reallege paragraphs 1 through 70 of this Amended Complaint and incorporate same by reference.

72.

To the extent that the Corps' recent closure of the MRGO, and the Corps' construction of the new Hurricane and Storm Damage Risk Reduction System operate in such a fashion as to ameliorate, attenuate and ultimately eliminate the risk of recurrent flooding (which is of such a scale as to warrant a finding of appropriation of a servitude of flowage or drainage, a gratuitous servitude or flowage easement, or deprivation of other property interests protected by Louisiana law), plaintiffs have been deprived of the use, occupancy and enjoyment of their immovable property (including its improvements and uses) for the period of time between completion of MRGO through closure, rehabilitation and elimination of the flooding and risk of same. In that event only, the plaintiffs will have suffered a temporary taking of their property, instead of a permanent one, without just compensation. Stated differently, to the extent that the  Corps' recent actions in closing the MRGO and constructing the HSDRRS have eliminated the flowage or drainage servitude imposed upon plaintiffs' property and have restored to the plaintiffs the full use and enjoyment of their property, the government's permanent taking of plaintiffs' property will have been converted into a temporary taking of that property, and plaintiffs are entitled to compensation for the taking of their property over the period prior to such restoration.

73.

Because the government's actions in connection with the MRGO project were undertaken with disregard for the consequences to plaintiffs' properties, and because the consequences to plaintiffs' properties were the direct, natural, or probable result of authorized activities by the government in connection with the MRGO project, the government's intent to invade plaintiffs' protected property interests may be inferred.

**Fourth Count:   Taking of Flowage and Draining Servitudes.**

74.

Plaintiffs reallege paragraphs 1 through 73 of this Amended Complaint and incorporate same by reference.

75.

As a direct, natural, and probable consequence of the MRGO project, including the continued operation, maintenance, and dredging attendant to this project, plaintiffs' properties have been subjected to actual flooding and/or the risk of frequent and inevitably recurring flooding, such that plaintiffs have been deprived of the use, occupancy and enjoyment of their immovable property (and the uses and improvements), resulting in a permanent taking of their property for a public use, without payment of just compensation. The flooding of plaintiffs' property is recurring and is necessarily incident to, and an inevitable consequence of, the creation, dredging and maintenance of the MRGO by the Corps.

76.

Because the government's actions in connection with the MRGO project were undertaken with disregard for the consequences to plaintiffs' properties, and because the consequences to plaintiffs' properties were the direct, natural, and probable result of authorized activities by the

government in connection with the MRGO project, the government's intent to invade plaintiffs' protected property interests may be inferred.

77.

As a result of the foregoing, and in addition to the other causes of action asserted herein, the United States has taken permanent easements or servitudes of flowage and drainage over plaintiffs' property, which it has permanently taken for a public purpose, without just compensation.

**Fifth Count:   Violations of contracts (servitudes).**

78.

Plaintiffs reallege paragraphs 1 through 77 of this Amended Complaint and incorporate same by reference.

79.

The Biloxi MRGO Servitudes and the Lake Eugenie MRGO Servitudes provided to the government 1,500 feel servitudes to build the MRGO "in accordance with the recommendation of the Chief of Engineers as contained in House Document No. 245, 82d Congress, 1st Session, and Additional provisions of said above Act of Congress…."  These documents provided for the construction of a waterway with a surface width of 650 feet and a bottom width of 500 feet.

80.

The Biloxi MRGO Servitudes and the Lake Eugenie MRGO Servitudes provide that the grantor "will be left as the owner of the land immediately adjacent to the waterway itself on both sides of the proposed waterway with perpetual access to said waterway for commercial and other purposes and with the right to construct on its own land…"

81.

The Biloxi MRGO Servitudes and the Lake Eugenie MRGO Servitudes do not give the government the right to build or maintain a channel with a surface width that exceeds 650 feet, and the government had a contractual continuing duty to maintain the banks of the channel so as to prevent widening and marsh erosion. Furthermore, plaintiffs' right to enforce the government's duty to maintain the channel continues to this date and throughout the length of the servitudes.

82.

The government has breached its contractual obligation to maintain the banks of the channel, and to the extent that the channel has encroached upon land outside of the servitudes, "the government must be held liable for a taking." *Kingspoint* at p. 20.

83.

If the Biloxi MRGO Servitudes and/or the Lake Eugenie MRGO Servitudes do not require that the government maintain the channel, then the Louisiana Civil Code's suppletive rules for immovable property, which – – together with relevant case law – – come into play when issues are not explicitly disposed of in the writings of the parties, apply. Louisiana Civil Code, Art. 697.

84.

In Louisiana, a person having a servitude or another's land has a continuing duty to use the servitude in such a manner as not to "aggravate" or damage the servient estate. If the owner of the servitude uses it in an authorized manner, the owner of the servient estate may maintain an action for damages resulting from such use. Therefore, in accordance with Louisiana law,

plaintiffs hereby assert a claim for the government's breach of the Biloxi MRGO Servitudes and

the Lake Eugenie MRGO Servitudes and demand payment in the amounts set out in ¶ 19.

**Prayer for Relief.**

**WHEREFORE**, plaintiffs demand a judgment against the United States of America, as

follows:

    a.    Finding that plaintiffs' properties have been taken for a public purpose entitling plaintiffs to just compensation in accordance with the Takings Clause of Amendment V to the United States Constitution;

    b.    Finding that the government breached the servitude agreements and awarding damages for breach thereof;

    c.    Awarding just compensation for the properties taken to date in the amount of at least 100 million dollars for the properties adjacent to the MRGO and an amount to be determined by the Court for the properties beyond the servitudes;

    d.    Awarding just compensation for the cost of providing shore protection to prevent future land erosion in the sum of $59,242,000, or payment of the value of the properties that will be taken through erosion in the future if shore protection is not provided, in an amount to be determined by the Court;

    e.    Awarding all reasonable costs, disbursements, and expenses, including reasonable attorneys, appraisal, expert witness and engineering fees pursuant to 42 U.S.C. Section 4654(c), plus appropriate interest, compounded (per USCFC jurisprudence), legal interest pursuant to 28 U.S.C. § 1961, and all costs pursuant to 28 U.S.C. §1920; and

    f.    For such other general, legal and equitable relief which this Honorable Court is empowered to provide, and to which plaintiffs are entitled.

DATED this 29th day of October, 2013.

Respectfully Submitted:

Camilo K. Salas III (Louisiana Bar No. 11657)
SALAS & Co., L.C.
650 Poydras Street, Suite 2000
New Orleans, LA  70130
Telephone:  504-799-3080
Fax:  504-799-3085
E-Mail:  csalas@salaslaw.com

*s/Camilo K. Salas III*

Attorneys for Plaintiffs
Biloxi Marsh Lands Corporation and
Lake Eugenie Land & Development Inc.

OF COUNSEL:

Charlton B. Ogden III
TAGGART MORTON, LLC
2100 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2100
Telephone:  (504) 599-8505
Fax:  (504) 599-8501
E-Mail:  cogden@taggartmorton.com